**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-14054-CR-MARTINEZ/LYNCH(s)(s)**

**UNITED STATES OF AMERICA,**

> **Plaintiff,**

**v.**

**SAIL E. MARTINEZ,**

> **Defendant.**
_____/

FILED by _____ D.C.

DEC 1 3 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON DEFENDANT'S
## MOTION TO SUPPRESS STATEMENT [D.E. #69]

**THIS CAUSE** having come on to be heard upon the aforementioned motion and this
Court having reviewed the motion, the government's response, and having conducted an
evidentiary hearing on December 9, 2011, makes the following recommendation to the
District Court:

1.     The Defendant's motion is fairly succinct.  It alleges that any post-arrest
statements made by him should be suppressed because "Prior to the reading of the
defendants Miranda rights, the defendant was spoken to by a man with a beard who told
him that he would be beaten up to the extent that he would remember the beating for the
rest of his life unless he spoke to them, about his arrest. At the same time, this agent flexed
his arm before he read the defendant his Miranda rights." This is the sum and substance
of the Defendant's motion.

2.     The first witness called by the government was Agent Thomas of Homeland
Security Investigations.  He is the case agent in this matter.  On or about September 2,
2011, his agency received information from a confidential informant (CI) concerning a
planned robbery of money couriers in Fort Pierce, Florida.  The CI informed Agent Thomas
that he had been approached by someone he believed to be an illegal alien to have the CI
commit an armed robbery of some money couriers in Fort Pierce, Florida.  Once this
information was received, recorded telephone conversations were monitored between the

CI and co-defendant Geovani Sales. There were over four telephone conversations in all which were recorded between these parties on September 2, 2011.

3.     On September 2, 2011, this Defendant along with his two co-defendants named in this Indictment picked up the CI in West Palm Beach, Florida, and discussed committing the armed robbery of the money couriers in Fort Pierce. All four individuals then drove to look at the store in Fort Pierce where the robbery would take place. They also drove to a McDonald's in the Orlando area where a similar robbery was to take place as well. Agent Thomas identified the Defendant in court as one of the individuals involved in these discussions with the CI.

4.     The CI told Agent Thomas that the Defendant was illegally in the United States and participated in discussions concerning the commission of the intended robbery of the money couriers. Co-defendant Sales asked the CI to get someone to help him commit the robbery.

5.     On or about September 9, 2011, the CI met with the Defendant and both co-defendants in West Palm Beach and then drove to the Fort Pierce area to meet the second armed robber to discuss the robbery further. They were to meet at a Circle K store on Delaware Avenue in Fort Pierce. In this instance, the person they were to meet as the second robber was actually an undercover officer (UCO). All of the conversations were taking place within the vehicle in which the Defendant, the co-defendants and the CI were traveling and were being monitored by Agent Thomas and other agents. While Agent Thomas admitted he is not fluent in Spanish, he stated that the other agents monitoring the conversations did understand Spanish. Based upon the monitored conversations, Agent Thomas believed that the Defendant and his co-defendants had a firearm in the vehicle. The firearm was to be turned over to the UCO to commit the armed robbery.

6.     Agent Thomas stated the UCO was instructed to walk into the Circle K store after the meeting with the Defendant and others had concluded. This would be the signal

2

that the discussions of the robbery had been completed and the law enforcement officers on surveillance would move in to take the Defendant and co-defendants into custody.

7.      Agent Thomas set up surveillance across the street from the Circle K store on Delaware Avenue in Fort Pierce where he was observing the store from a vacant lot. He saw a white Tahoe arrive which contained the CI, the Defendant, and the co-defendants. He was aware of this vehicle since he followed it to the Fort Pierce area from West Palm Beach. Agent Thomas observed all the occupants of the Tahoe get out and shake hands with the UCO. This meeting was monitored and recorded. All of the individuals were overheard discussing the armed robbery.

8.      The Defendant and his co-defendants also discussed going to Orlando to commit an armed robbery similar to the one they intended to commit in Fort Pierce. It was about this time that the UCO made a motion as if he was tucking a firearm into his waistband and then walked into the Circle K store. This was the signal to arrest the Defendant and co-defendants. Agent Thomas testified that the firearm had been obtained from the interior of the white Tahoe and given to the UCO by the Defendant and his co-defendants. Once this signal was given, the Defendant and the co-defendants were taken into custody.

9.      The Defendant was arrested by Agent Goodwin. Agent Thomas went across the street to the Circle K store. The Defendant was searched and then turned over to Agent Lampkins. Since the Circle K store was open and doing business at that time, all of the individuals were moved across the street from the Circle K store to an area where they could be processed further without interfering with the store's patrons.

10.     Agent Thomas observed Agent Escobar of Homeland Security Investigations interviewing the Defendant in the back of a government vehicle at the scene across the street from where the arrest took place. At no time did Agent Thomas observe anyone threaten the Defendant or promise the Defendant anything.

11.    Government Exhibit No. 1 admitted into evidence are copies of photographs of the Tahoe vehicle at the scene together with the photo of the tag of the vehicle.  This photo was taken by Agent Thomas on September 9, 2011.  Government Exhibit No. 2 in evidence is a copy of two photographs taken by Agent Thomas on September 9, 2011 of the Defendant in the back of the government vehicle being interviewed by Agent Escobar.  Finally, Government Exhibit No. 3 are copies of two photographs of the firearm which was seized by the agents upon the arrest of the Defendant on September 9, 2011.  These photographs were taken by Agent Thomas as well.

12.    Agent Thomas testified that the only agents who he believes came into contact with the Defendant other than himself were Agent Goodwin, Agent Escobar, Agent Guinart, and Agent Moran.  Agent Thomas stated that he believes all of those agents are fluent in Spanish except for himself and Agent Goodwin.  Further, since the Defendant's motion alleges that someone with a beard had threatened him, there was testimony concerning facial hair.  Agent Thomas testified that he believes Agent Escobar, Agent Guinart, and Agent Moran all had some sort of facial hair, although he stated that he does not actually pay attention to "the grooming habits of other agents."  Agent Thomas appeared in court to have a goatee.

13.    Agent Thomas testified that he was not present when the Defendant was read his Miranda rights nor was he present when the Defendant made any statements to law enforcement.  Agents Escobar and Guinart were the individuals who signed the Miranda form which was admitted into evidence as Defendant's Exhibit No. 1.  Since he was not present for the execution of that form, Agent Thomas could not testify as to who signed or initialed any of the areas on that form.  Agent Thomas stated that he believed the Miranda form was not read to the Defendant by the other agents until the Defendant had been moved across the street from the Circle K store which was between 11:45 a.m. and 12:00 p.m. on September 9, 2011.

14.     The next witness called by the government was Agent Escobar. He testified that on September 9, 2011 he first made contact with the Defendant at the parking lot adjacent to the Circle K store on Delaware Avenue in Fort Pierce. Agent Lampkins turned over custody of the Defendant to Agent Escobar. Agent Escobar identified the Defendant in court as the individual he knows to be Sail Emiliano Martinez and with whom he had contact in this case.

15.     Agent Escobar initially interviewed the Defendant in the parking lot and read the Defendant his Miranda rights from a Spanish Miranda form before speaking with the Defendant. Agent Escobar reviewed Defendant's Exhibit No. 1 in evidence and identified that as the same Spanish Miranda form which he read to the Defendant line-by-line. He had the Defendant sign and/or initial certain portions of this form.

16.     Agent Escobar stated that he read each line of the Miranda form to the Defendant in Spanish. He then asked the Defendant if he understood those rights at the end of each line. He stated that the Defendant acknowledged orally that he understood those rights and initialed each line verifying that he understood each right as requested by Agent Escobar. At the bottom of the Miranda form, the Defendant was asked to sign the form acknowledging that he understood his rights, was waiving his rights and agreeing to speak with Agent Escobar. The Defendant told Agent Escobar in Spanish that he could not write very well. Therefore, Agent Escobar directed him to simply make his mark which he did with multiple "x's" on the bottom of the page. The Defendant also wrote the name "Sail". Agent Escobar also requested the Defendant to place a fingerprint on the right corner which was done as well. All of this was completed in the government vehicle in the parking lot. Agent Guinart was present at that time and acknowledged as being a witness on the Miranda form, Defendant's Exhibit No. 1.

17.     At this hearing, Agent Escobar translated the Spanish <u>Miranda</u> form into English. His recitation and the rights set forth on that form appear to this Court to comply with the rights required under <u>Miranda</u> and the applicable case law.

18.     Agent Escobar testified that not only did the Defendant listen to what Agent Escobar was reading to him in Spanish, but that the Defendant actually had the form in his hands and was reading it as well. Agent Escobar does not know whether or not the Defendant was able to read each word. However, Agent Escobar stated that the Defendant did appear to be reading the form as Agent Escobar orally read each of those rights to the Defendant in Spanish. It was after each of these rights that Agent Escobar asked for the Defendant to respond as to whether or not he understood each right. The Defendant orally stated that he did understand each right and initialed after each line as requested by Agent Escobar.

19.     Agent Escobar stated that he did not have a beard or any significant facial hair on September 9, 2011. He appeared to have a light beard and mustache in court at this hearing. Agent Escobar stated that neither he nor any other person in his presence threatened the Defendant in any way nor did anyone "flex" their arms in a threatening manner to the Defendant. The Defendant was not promised anything by Agent Escobar nor by any other agents in his presence. Agent Escobar does not believe that there were any other agents alone with the Defendant at any time after the Defendant was taken from the parking lot across from the Circle K store until the time when the Defendant's statements were actually concluded at the Homeland Security Investigations offices around 3:00 p.m. that same day.

20.     Agent Escobar estimated that his interview of the Defendant began at approximately 12:30 p.m. in the parking lot area across from the Circle K store. The Defendant was then taken to the Homeland Security offices where he arrived at approximately 1:30 p.m. that same day. The Defendant was placed in a holding cell and

6

the interview was resumed by Agent Escobar at approximately 2:00 p.m. Agent Escobar stated that at no time did anyone else have any contact with the Defendant outside of his presence.

21.     The Defendant never requested to stop talking nor did he ever request to speak with an attorney. No threats or promises were made by Agent Escobar nor any other agent in his presence at the Homeland Security office. The Defendant did not appear to be under the influence of any drugs or alcohol. The Defendant seemed lucid according to Agent Escobar. The Defendant never told Agent Escobar that anyone else had threatened him. In fact, the Defendant was handcuffed in front to make him more comfortable. Agent Escobar recalls that the Defendant was fully cooperative throughout the interview process which concluded at 3:00 p.m. that same day.

22.     Agent Escobar has no reason to believe that the Defendant did not understand each of his rights read to him from the Spanish <u>Miranda</u> form, Defendant's Exhibit No. 1. Agent Escobar explained to the Defendant by signing the form, making his mark, and acknowledging on the bottom of the form, that the Defendant was waiving his rights which had previously been read to him and was agreeing to make a statement to law enforcement. Agent Escobar stated that the Defendant kept reiterating that he wished to cooperate.

23.     Agent Escobar did not re-read the <u>Miranda</u> form nor advise the Defendant of his <u>Miranda</u> rights again when the interview continued at 2:00 p.m. at the Homeland Security Investigations offices. When the interview did resume at 2:00 p.m., Agent Escobar told the Defendant that he believed the information the Defendant had previously given him was not completely truthful and that it was illegal to give false information to a federal officer. In response, the Defendant stated that the information was part truthful and he agreed to continue the interview. Agent Escobar stated that at no time did the Defendant ask for anything except maybe water, which was provided to him.

24.     At the conclusion of Agent Escobar's testimony, counsel for the government announced that there were other agents present to testify should the Defendant wish to call them as witnesses.  However, the government rested without calling any further witnesses. Counsel for the Defendant announced that the Defendant would not present any witnesses or evidence at the hearing.

25.     Counsel for the Defendant argued that in addition to the allegation that the Defendant was threatened by an agent, the Defendant should have been re-advised of his Miranda rights before the second interview began at the Homeland Security offices at 2:00 p.m.  Counsel for the Defendant argued that once Agent Escobar told the Defendant that he could be charged with a crime for giving a false statement to a federal officer, the Defendant was entitled to be re-advised of his Miranda rights.

26.     In response, counsel for the government argued that there is no case law requiring a re-advising of Miranda by the same agent taking a statement from the same defendant on the same day with only an hour and a half intervening between the conclusion of the one interview and the resumption of the second interview.


ANALYSIS

27.     This Court finds that the Defendant was advised of his Miranda rights properly by Agent Escobar and this advice of rights was done in the Defendant's native language being Spanish.  Further, the totality of the evidence presented reveals that the rights were read individually by Agent Escobar and at the end of each right, the Defendant was asked to acknowledge that he understood those rights. The Defendant orally stated that he did understand each right and initialed the form after each right to further acknowledge his understanding.  Agent Escobar meticulously made certain that the Defendant understood each right and the entire Spanish Miranda form at the conclusion of reading the form to the Defendant.   The Defendant was also afforded the opportunity to read and review the

8

Spanish <u>Miranda</u> form himself which he appeared to do according to Agent Escobar. Finally, the Defendant signed the form on the bottom and placed his fingerprint there in acknowledgment that he understood all of his rights and was waiving those rights according to the testimony of Agent Escobar. Therefore, this Court finds that the Defendant's waiver of his rights was voluntary and was the product of a free and deliberate choice rather than any intimidation, coercion, or deception. <u>United States v. Toyer</u> 274 Fed. Appx. 844 (11th Cir. 2008).

28.     The government has established by a preponderance of the evidence that the Defendant waived his rights knowingly and voluntarily. There is no evidence of any threats, promises or other acts of intimidation which affected the Defendant's waiver of his <u>Miranda</u> rights. The record is completely devoid of any such evidence to support the Defendant's allegations set forth in his motion. <u>United States v. Wright</u>, 300 Fed. Appx. 627 (11th Cir. 2008) and <u>United States v. Harris</u>, 151 Fed. Appx. 882 (11th Cir. 2005).

29.     The Defendant further argues that the agents should have re-advised him of his <u>Miranda</u> rights prior to re-initiating the interview at 2:00 p.m. at the Homeland Security Investigations offices. The testimony received by this Court was that the interview at the scene began at about 12:30 p.m. and that the Defendant was transported to the Homeland Security Investigations offices where he arrived at approximately 1:30 p.m. The testimony further reveals that the Defendant was in custody the entire time and was not contacted by any other agents outside of Agent Escobar's presence. Agent Escobar then continued the interview of the Defendant at approximately 2:00 p.m. Therefore, it appears from the record that the intervening time period could not have been longer than an hour and a half.

30.     Even if the Defendant had been transported to the Homeland Security offices at 12:30 p.m., which is the time that Agent Escobar testified he began the interview at the scene, there would only be an hour and a half between 12:30 p.m. when the Defendant was

9

advised of his <u>Miranda</u> rights and 2:00 p.m. when Agent Escobar testified the interview continued at the Homeland Security Investigations offices.

31.     This Court finds that even a one and one-half hour interval between his initial advice of <u>Miranda</u> and the continuation of the interview by Agent Escobar is not so lengthy so as to lead the Defendant to believe that his initial advice of Miranda rights in the back of the government vehicle did not pertain to the continuation of the interview by Agent Escobar at 2:00 p.m. at the Homeland Security Investigations offices.  The Defendant presents no case law requiring a re-advice of <u>Miranda</u> rights under such circumstances.

32.     Finally, this Court finds that the Defendant did not request an attorney at any point subsequent to being advised of his <u>Miranda</u> rights.  The Defendant never requested to stop answering questions being posed by Agent Escobar.  In fact, Agent Escobar's testimony was that the Defendant continually stated that he wished to cooperate.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant's Motion To Suppress Statement [D.E. #69] be **DENIED**.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Jose E. Martinez, the United States District Judge assigned to this case.

**DONE AND SUBMITTED** this _13th_ day of December, 2011, at Fort Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. Jose E. Martinez
AUSA Carmen M. Lineberger
Michael B. Cohen, Esq.